317-0677 Erie Insurance Exchange, Hull, Kansas. Listing of the first three families by Kennedy and Tiffany Hull, et al. Appalachians by Jennifer Tregello. Thank you. May I please? My name is Bruce Simmons, and I represent the Erie Insurance Exchange. I'm sorry, Your Honor. You're outspoken, at least for now. There may be some disagreement. My name is Bruce Eckstein. I represent Erie Insurance Exchange as the appellant in this matter. Tracy Kennedy, Michael Kennedy, and Tiffany Holland seek defense and indemnity coverage for an incident that the primary policy and the umbrella policy at issue in this case explicitly exclude under three distinct exclusions in the policies. The exclusions are, number one, an exclusion for business pursuits. Number two, an exclusion that bars coverage for any business that requires a license. And the third exclusion is an exclusion that bars coverage when the insured has in her care someone who is under the age of 21. Now, if the first exclusion is found not to be an exclusion because there's an exception, the other two don't matter, do they? Or do they? No, I believe that they do matter, Your Honor. The first exclusion has embedded in it a clarification that the exclusion and the policy in the primary policy does not cover any business that requires a license, period. It does not cover it. But independent of that exclusion, the business pursuits exclusion, is a separate and distinct exclusion that bars coverage for persons under the age of 21 in the care of the insured. And those exclusions, yes, are mutually exclusive. And I don't believe that there's any disagreement about that. So these are independent bases to avoid coverage in this case. Those two. Those two, and I would argue three, really, because the business pursuits exclusion, first of all, requires a non-business pursuit. That's number one. But it also states that regardless of whether there is a business pursuit activity, the exclusion does not apply to a business that requires a license. Let's deal with this exception, okay? Because really in a 30,000-feet observation, your opponents are attempting to say coverage is under a premises liability issue, or premises liability coverage. That's the issue you're on. Yeah, that's really the issue. So tell us, let's go right, focus on that. Very good. The exclusion is set up in a way that is very simple. It's just two sides of the same coin. The exclusion says that the primary policy excludes coverage for business pursuits and business activity. And then the supposed give back or exception says that it doesn't apply to activities that are non-business. They are entirely compatible and consistent ideas within the exclusion. And they say virtually the same thing. I would posit, Your Honor, that even without the exception, the exclusion does not add any meaning to the exclusion without the exception. In other words, an exclusion that says we don't cover business pursuits is the same as an exclusion that says we don't cover business pursuits, but we do cover pursuits that are non-business. It's six of one and one half a dozen of the other. And the argument that Holland, in this case, is the only one that filed the appellate brief, the claimant in the underlying case, is trying to make is that the exception to the exclusion dramatically changes the analysis that this court should conduct. And we disagree with that proposition. There is no case law in Illinois, in the third district, or any other district that supports that proposition. And more directly to your point, Justice Holdridge, there is no case in Illinois that sets up the dichotomy that Holland seeks to impose on this court, that there is some tension between premises liability and the business pursuits exclusion. There are five cases that we have identified that address this exclusion, and we have somewhat of a closed universe of case law in this area. There is no disagreement about this. Beginning in 1988, in the Bassett case, the fifth district decided that the exclusion, which did contain an exception in that case, barred coverage when there was an accident in a driveway, where the insured was conducting a daycare business out of her home. Importantly, in that case, which was decided in 1988, it is one of the few cases that cited the Moore case on which Holland places all of her argument here. And that supposed particular activities case, particular activities test in Bassett, was cited and rejected on a case that involved an accident in the driveway. And the court in the fifth district found that the accident in the driveway was related enough to the business activity of daycare operations that the exclusion applied. And if driving in the driveway to get to and from the daycare operation is sufficiently related to be a particular activity related to a business exclusion for daycare operations, then certainly the pool in this case, where the children under the care of Tracy Kennedy were swimming, must be related to the daycare operation. Even after Bassett in the Thule case in the Seventh Circuit decided in 1994, another case that involved the exclusion and the exception to the exclusion, virtually identical language to the wording in this case, the court upheld the exclusion in facts involving a choking accident. Following Thule in 1996, the case, the second district in Smiley, again upheld the exclusion. And Smiley is indistinguishable. The incident in Smiley is indistinguishable from the facts in this case. It is a drowning case. And that's exactly what we have here. We have a drowning, and Smiley in the second district in 1996 said that the drowning was excluded by the business pursuits exclusion in the policy. Was there an exception in that policy? There was not an exception in that policy, Your Honor. There wasn't. But again, our position is that the exception does not give back any coverage that is already taken away by the exclusion itself. It simply says non-business activity is not excluded. And in Smiley, the court specifically determined that the pool was related to the business activity of the daycare facility. And then following Smiley. This was a 2-year-old, right? This was a 2-year-old, Your Honor. A 2-year-old swimming in the pass? I beg your pardon? Was it a 2-year-old swimming? At the daycare facility? We don't know that, Your Honor. There's no indication in the record. We do know, however. This is a 14-year-old. It's a 2-year-old. It was a 2-year-old, yes. But we do know, however, that the 2-year-old was in the care of Tracy Kennedy for months. And we do know that Tracy Kennedy was running the daycare operation out of her home for 11 months and had as many as 11 children under her care and charged $150 to $175 per child per week to take care of them. Well, there's no question. That's all conceded that it was a business. Yes. Okay. Yes. Now, let's go back to that exception, the language actually in the policy, which is relevant to this case. What does it say exactly? The precise language in the policy, in the primary policy, states that bodily injury, property damage, and personal injury arising out of business pursuits of anyone we protect is excluded. We do cover activities normally considered non-business. Let me interrupt. Is there any support that we saw for the test being the reason the child was on the premises? Any reason other than the business of daycare that that child was there? Are you asking, Justice Wright, whether the child in this case was there because of the daycare operation or in the case law? Shouldn't the test be, and is it supported by the case law, that when you're looking at the business purpose or the business, the goal of the business, whether it's excluded under the policy, don't we really have to look at why was that child on the premises? Because if the child was a neighbor's child that was visiting the kids at daycare, that's a very different scenario from a child brought to the premises for the purpose of daycare. I would agree with that, Judge. I would agree with that. And in this case, the child who drowned was in the care of Tracy Kennedy for her daycare operation. But since the child was there to be supervised, it's a little muddier. It may appear a little muddier, Justice, but the cases have decided, every one of the cases has decided, that the overall requirement and the overall duty that the daycare operator has to the children in its charge is to keep a safe operation. And that includes safe conditions on the property. The decision in Moore discusses safe conditions on the property. The decision in Thole, I believe, discusses safe conditions on the property. And that is the overarching theme of the cases, that when you are running a daycare operation, you must keep it safe and the conditions must be safe. So the idea that this was... Where do we draw that conditions? I kind of wanted you to continue with your exception, but now that you've gotten there, because the language is important in any insurance policy, obviously. Okay, and construed against the drafter as a general principle. Okay, so where do we circle the wagons around the conditions, as we say, of the property? There's nothing in this record to suggest that the business activity included group swimming of the people in the lady's charge. Well, in fact, well, there's nothing in the daycare operation. We don't have anything from Tracy Kennedy that described what her daycare offered. But we do know from the record, quite conclusively, that Tracy Kennedy allowed the children in her care to use the pool, which is what triggered the DCF investigation. And there is no dispute that DCSF initiated an investigation and found that there were seven children swimming in the pool. And they initiated that investigation and they warned Tracy that if she didn't have a license, that she would be operating, that she would be subject to criminal penalties. And moreover, DCFS warned Tracy in the letter on June 8th, that if she didn't have a license, that she would not have liability coverage for any accident that occurred on her property. She knew. She was warned in advance. And indeed, not only did DCFS warn her and tell her that she needed a license, because she was running a commercial daycare facility out of her house that involved children swimming in her pool, they prosecuted her. And Tracy Kennedy went to prison because of what she was doing at her home. For operating a daycare facility without a license? Is that what she was charged with? She was charged with several counts. One of those counts was operating a daycare facility without a license. And did she plead guilty to that? Or was she found guilty of that? She pled guilty to endangerment of a child. I believe that that was count three. But one of the charges was operating the daycare facility without a license. So you know, I'll probably disregard that because she would plead guilty and has been found guilty on that charge. No, she has. To me, it has no relevance. Let me back you up just a little bit. This is a summary judgment context here. Is it undisputed that she should have had a daycare license? It is undisputed. That is, getting back to the mechanics of an insurance dispute, the duty to defend is determined by the wording in the policy and the allegations in the complaint. It is alleged in the complaint that Tracy Kennedy advertised that she had a license and didn't have one. It is also undisputed that DCFS advised Tracy that she must have a license. And Tracy applied for that license and never got one. So if she were licensed, there would probably be a child caretaker ratio that would have prevented this kind of accident? Well, I assume that if she were licensed and that she would have to follow a litany of regulations promulgated by the State of Illinois to comply with whatever makes a safe daycare operation. What kind of pool was this? Was it an in-ground pool that's six feet deep or was it a little lower pool? It was an above-ground pool. I don't know that, Your Honor. I don't believe that that's in the record. Well, let's go back to that exception and just go to the exception and focus on that. If you could read the language to us. Oh, I'm sorry. The exception is simply, as I said, we do cover activities normally considered non-business. So a non-business activity would be covered. Again, it's just the other side of the same coin. But the case is there. Well, here's the thing. It's further than that. It doesn't mention like daycare and stuff like that. Well, it says occasional business activities of any. . . We do cover occasional business activities of anyone we protect. These include but are not limited to babysitting, ketting, lawn care, newspaper delivery, and other similar activities. Occasional business activities including daycare. This was not an occasional activity. This was an ongoing 11-month daycare operation that Tracy was running continuously in her home for as many as 11 children. And that dovetails. . . At that dichotomy where you say we cover occasional business activity as daycare is mentioned. I mean, the judge found an ambiguity here, right? The judge did. The judge did. But again, Your Honor. . . He did. He did. But his interpretation, I believe, is not consistent with the wording of the policy and the facts of this case. If we come to the motion. . . Back to the wording of the policy. Yes. Okay. It will never be read too often. Okay? I've read it many times, Your Honor. Okay. So read that exception again to me, please. The exception is we do cover, A, activities normally considered non-business, and then elliptical phrase, and down to D, occasional business activities of anyone we protect. See, that's the question I have is how do we define. . . We've got that subsequent phrase where you're saying business activities. Okay? But then we also cover activities. Yes. So what is this activity that the insured was engaged in or not engaged in at the time of the incident? The activity was the daycare operation, which was a business that Tracy Kennedy was running out of her home. Well, I don't think that's disputed that she was operating the daycare facility. And it wasn't occasional. It was consistent. That's not disputed either. But their position is is that somehow this is premises liability, which would be covered. And that has no basis in the policy. It also has no basis in the case law. Well, how about the activity of maintaining and having and maintaining the pool? That is part of creating a safe environment for the daycare facility. Is that established that the pool was part of the environment of the daycare? Yes. Yes, we believe that the record corroborates that without a doubt. And that was part of the business activity, the pool? That was part of the daycare operation. Oh, it certainly was, Your Honor. When the DCFS investigator came to the Kennedys' home, she discovered seven children in the pool. We don't know who those children were, though, do we? Well, they were children under Tracy's care. We don't know whether they were involved in the business, do we? I mean, are the children identified and who they are? The children are not identified in the pool. Okay, so they could be arguably children from across town, friends of her children. Arguably they could, Your Honor. But DCFS, to my knowledge, would not initiate an investigation and a complaint against a daycare facility operating without a license if Tracy were only in her house with her own children and their friends. I don't believe that DCFS would have any authority or jurisdiction over that. Any more than they could come to my house. I don't have a pool, but any more than they could come to my house and say to me, when I'm having a birthday party for my children and there's 10 people there, that there's something wrong. Not yet, anyway, but I'm afraid we're headed that way. That is a different story, Your Honor. Back to what I asked you before. Except for this Children's Family Services appearance and finding people were swimming, there's nothing, and that's the basis you say that they were involved in daycare. But there's no tie-in that here are the daycare clients, families that needed children, and that those are part of the integral part of the activity of daycare. Other than the fact that they were. There were children there, but are they identified? They're not identified. They're not identified as daycare clients, are they? They're not, except to say that, as I said, there's seven people there, and I don't believe that DCFS would have any authority or jurisdiction to conduct a licensing, to issue a licensing complaint unless the children at the Kennedy home were part of the daycare operation. The Kennedys only had four children themselves, and I think one of them was one-year-old. So I doubt that the one-year-old was in the pool. Well, yeah, but I think maybe this isn't clear on my part, but most children have friends who come and play in their yards and vice versa, and I'm not sure that DCFS, you know, that might have triggered an investigation wherein there is a finding that Ms. Kennedy is running a daycare, but I'm not sure what the parameters of that are. And I don't know if the DCFS report suggests that the pool is an integral part of the daycare operation. We don't know that from the DCFS report. There's no question that we don't know that. But what we do know is that from the case law, the daycare facility operator must keep safe conditions on their premises. And we do know from the case law in Smiley that... Yeah, but let's go to that driveway case in the Fifth District. Esset? Yeah. Clearly, parents must be able to access ingress and egress to the facility where they're dropping off children, and I can kind of understand where they're saying that's an integral part of the daycare operation. But here I don't know what the record says that the pool in the backyard is an integral part of the daycare operation. Are we to make that inference that it is? I don't think you need to make that inference, Justice Holdridge. What the cases say, and now we can get up to Mathis, a case that you are familiar with. Mathis is the only case in the Third District. It is controlling. And the only Mathis set forth two prongs for whether to enforce the exclusion. One, is the business regular and continuous? And two, did the insurer derive a portion of her livelihood from that business? That is what Mathis said in 1999, and Mathis did not cite more. Would you help me understand, and I'm looking at page 8 of your brief, it cites to C1132 in subparagraph 2D. It talks about the business activities, including babysitting, but isn't there also an exception to the exception? And that is business activities, regular or business activities, which I think the distinction for phrasing it that way means occasional business activities for which a person is required to be licensed. Should that be construed as an exception to the exception? I think it's a clarification because the licensing requirement doesn't talk about the difference between business and non-business activities. What it says is we bar business activity, but we don't bar non-business activity or occasional business activity like babysitting. That's the licensing statute. Are you talking about the licensing statute? Well, I was just going to mention the licensing statute. I'm setting it up from the beginning. From the beginning, the exclusion says we don't cover business pursuits, and then the exception to the exclusion says occasional business activities like babysitting is covered. But by the way, one thing is for sure, we do not cover any business that requires a license. So did the court find that phrase ambiguous? Is there an argument that's ambiguous? I just don't understand why that isn't the focus here. Oh, well, because Judge Holdridge asked me to focus on the exception and said get right to it. We believe that there is no argument. In fact, if I were to lead with this argument, we could dispense with the idea of is there a giveback, is there an exception, is there this, is there that. There is no disagreement about what the language says for the licensing requirement. There is no case law that says that the licensing requirement is ambiguous, and the appellees have not provided this court with any. The only argument that the appellees have made on this issue is that not all daycare businesses require a license. But that is not what the exclusion says. It says any business that does require a license is excluded. The allegations in the complaint specifically say that Tracy Kennedy advertised her business and that she had a license and that she didn't have one. The record is also absolutely clear and uncontroverted that DCFS required Tracy to get a license, warned her that she was operating an unlicensed business facility under penalty of law, gave her an application that Tracy began to fill out but never filled out before the incident. It is uncontroverted. There is nothing ambiguous about this expression in the policy. Yes. Yes. Yes. Yes. Yes. Yes. Yes. Yes. Yes. Yes. Yes. Yes. Yes. But there is no doubt, there can be no doubt that alleged in the complaint is that she advertised that she was a licensed daycare facility operator and that she was not in fact such. The reason I asked you early on in the argument, is it undisputed that she needed a license? It's undisputed. Now the trial judge here, part of his findings was that neither party here has provided evidence as to whether the swimming pool into which Abigail found her way was part of or an allowable aspect of the daycare for children. Aerie has failed to show that this injury arose out of the business activities of the Kennedys. Given that one, there's no such evidence presented. Two, it's Aerie's burden to prove the exclusion applies. And three, exclusions are narrowly applied. And four, when the principles of interpreting policies require an insurer to show the exclusion is clear and definite, restoration of coverage clauses are construed broadly and in favor of the insurer. I think the judgment is mistaken in the quantum of proof required of Aerie. Again, the judge is going back to the idea of whether the pool was an integral part of the daycare operation. And the judge, for Aerie, was not showing that the party or injury arose out of the Kennedys' business pursuits. Also, the court finds that the second very similar exclusion without a restoration of coverage clause appended is capable of two interpretations and is ambiguous when the policy is looked at as a whole. And then the judge goes on to those aspects. As I said, Judge, I think that the trial court mistakenly followed the idea of the competition between premises liability and business pursuits, which is not set forth in the case law. And the denial of your request for a summary judgment is very clear talking about the denial of Aerie's summary judgment motion. In the court's opinion, yes. The trial court also noted that Tracy Kennedy was running a consistent daycare operation out of her home. But he focused incorrectly on whether the pool was an integral part of the daycare operation. And as I said, we believe even if we are required to show that, that it was, but that is not the standard set forth in the case law. Most recently would be, as I said, is Mathis. Mathis did not talk about any dichotomy between premises liability and business pursuits. And it didn't talk about whether the suffocation, which was the incident in that case, was an integral part of the daycare facility. It said very bluntly, is it a regular and continuous activity? And number two, did the insured derive a portion of her livelihood from that activity? And we answer those questions in this case with a resounding yes. And there is no dispute about this. Thank you. Good morning. May it please the court. My name is Jennifer Turriello. I'm here representing the defendant, Tiffany Holland, who is the special administrator of the estate of Abigail Holland, deceased. With me today at council table is Mr. Manzella, who is the attorney for Ms. Holland and the underlying tort action, and he's also my co-counsel here in terms of the coverage litigation. Can we hold this down to the essential issue? Absolutely. I want to jump right on what Mr. Lickstein just ended with. If Erie wants the test that's going to be employed in this case to be whether or not Ms. Kennedy was conducting a business pursuit and whether or not the injury arose out of a business pursuit, which that's that two-pronged test regarding is it continual activity and did she derive a profit, which actually aren't issues in this case. But if that's what they want, they need to rewrite their policy, because they have this non-business activities exception running around in their policy, and that language mandates that we engage in this particular activities test analysis. That's what's been done in Illinois. There are cases that support the application of that test. MORE is the first one. Mr. Lickstein started with a discussion of Economy v. Bassett, because he likes the result, the end result. Before Economy v. Bassett came MORE, MORE employed the particular activities test in a case where a child pulled a hot, a pan of hot water onto himself while the caregiver was fixing lunch for both herself, her children, who were also in her care at the time, and the child who was injured. And the particular activities test says we have to examine the activity that produced the injury. We view that very narrowly, and we look to see what's the connection to an entrepreneurial endeavor, and that's how employing that test, which again, the only Illinois case law that we have, MORE and Economy v. Bassett. Those are the only ones. All the other cases that Erie wants to talk about, the Mathis case. No exception in that policy. There was not a non-business activities exception in that policy. The same with Smiley. So you're saying that the language by the insurer himself sets up the need to analyze and make a finding. Is that what you're saying? Absolutely. It's the analysis called for by the language Erie chose to put in its policy. And if they don't like it, if they want the analysis to be like it is in Smiley and Mathis, then they need to remove the exception from their policies. What if you're taking a subparagraph provision B with regard to licensing? I'd like to hear your point of view on that. Absolutely. Because I want to get at your question that you asked, Mr. Lipstein. And as I'm hearing him talk about what the policy language is, it's not just that we don't cover a business that requires a license. If you look at it's we don't cover regular business activities or business activities. Again, we're still talking about activities. The word activities is still running around in this policy. Even in that provision, business activities for which a person is required to have a license by the state. I don't lose on that exclusion because the underlying suit isn't about a business activity. This accident could have happened even if there had been a piece of paper from the State of Illinois given to Mrs. Kennedy allowing her to operate a daycare. In fact, if you look at most of the cases, the people are licensed by the state. That is because why? You? Because it's about property maintenance. It's a premises liability issue. That's correct. And the underlying tort complaint makes that clear. And it's very important, although I didn't hear Mr. Lipstein talk about it today, that when this complaint, the tort complaint, hit the desks of the ERIE personnel, they identified it, too, as being a premises liability case. To me, there's a difference between babysitting and daycare. Babysitting is what you do with the neighbor's kids or at night or your teenager does it for about an hour. Daycare is a different situation than that. I would agree with that. More frequent, permanent, longer duration, not just the typical parents going out at night. Sure. Absolutely. But I do think it's important that when the complaint hit the desks of the ERIE personnel, and we're supposed to be looking, we're just here on a duty to defend. So we've got to consider all of those things, too. We've got to construe the complaint liberally in favor of coverage. We've got to give all benefits. The benefits of any doubt go to the insurance, not the insurance company. And here they looked at the complaint and said, the suit alleges premises negligence. And that's the key for us in saying that the exception is what applies. Because pool maintenance is something the Kennedys had to do, even if they didn't have a home daycare. They're property owners. They had their own children living at the premises. There's kids in the neighborhood. You have to secure your pool if you have one. That's a duty that would be ever present, even absent the daycare. And that's why the pool maintenance is not tied or associated with a babysitter function, like in the Economy v. Bassett case, where, you know, it's part of a babysitter's function or associated with babysitting, that you're going to have parents coming and picking up their children, that you would need to be careful about the activities in the driveway. Here, and I also really want to make this clear, because I think some liberties are being taken with the record. There is zero evidence that Ms. Kennedy allowed daycare children in that swimming pool. There is no evidence of that. This pool was not part of any profit motive. It was not something that the example, and it's one that I made at the trial court level, is swimming lessons. If she would have said, sign your kids up at my daycare, I'll give them swim lessons while they're here. Completely different story, different case. My argument would absolutely be undercut by that. She didn't have to be swimming lessons if she advertised recreation. Absolutely. That, too. And we have no evidence of that on this record. None. And the only thing being relied upon on Erie's part is all of this DCFS documentation, which is unauthenticated. It contains hearsay statements. We objected to its use. But even if we consider what's in it, it doesn't identify the children that were in the pool on the day the DCFS investigator came out. And I would dispute Mr. Lickstein's representation that DCFS came out there because there were all these kids in the pool. In fact, what we've learned is that Mr. Kennedy and Mrs. Kennedy at the time this was all happening were having some marital strife, and he suggested that he was the one who actually contacted DCFS. He didn't want her running a daycare out of the home. He called DCFS on her. It wasn't that somebody reported a bunch of daycare kids were in the pool and the investigator showed up. So that is not, in fact, what occurred. But the main point in our argument is that the case law in Illinois, the only cases that we have that pertain to this policy language are the Moore case and the Economy v. Bassett case. The case law that Erie wants to focus on are all cases where there wasn't a non-business activities exception. And if that's what Erie wants, if that's the analysis Erie wants, then it needs to rewrite its policies. It's simple. We can delve into the ambiguity argument because in my view it's just as equally important as the argument about the exception applying. Here, you look at this. It's not whether or not it makes sense to Erie. It's not whether or not it makes sense to Erie's coverage lawyer. It's what the average policyholder would pick up this document and understand it to mean. And where the licensing clause is, and I think Mr. Glickstein's counting that as an additional exclusion. I read it as part of the business pursuits exclusion. It's one exclusion. It's just got a lot of subparts. It makes what's already a bad situation even worse in terms of ambiguity. Looking at the various parts, there's no endeavor on Erie's part to explain how those components work with one another. And all the while, mind you, Erie's telling its insurance and its prefatory language, yeah, we write our policies with really clear language so you can really understand them. Hardly. That's my response to that. Hardly. And not to mention they tell their insurance in the prefatory language of their policies, we're going to give you as near perfect protection and coverage as possible. We have to consider the whole policy when viewing ambiguity arguments. And I submit here the trial court did not err at all in finding that these provisions, this exclusion and its exception read together, are unclear and susceptible of multiple interpretations. Courts from across the country have looked at this exact language and concluded the same thing. The only Illinois case we have on point, Moore, also concluded that this policy language was ambiguous and had to be construed in favor of coverage for the policyholders. So again, even some of the case law that Erie has cited, the Thiel case out of the Seventh Circuit, has talked about that this particular language, its meaning is not clearly evident. If you don't want to cover a home daycare, here's what you say. It's very easy. You could define business as some cases have done, like let's look at Smiley and Mathis. In those cases, business included the operation of a home daycare. The term business. Erie could do that here. Erie could say a business includes the operation of a home daycare, and we don't cover it, period. No exception. None. Done. That's clear language. What we have here? Unclear. Completely unclear. And that lack of clarity carries over to the other exclusion, which we, the Court didn't get into with Mr. Lickstein, but I want to examine that second exclusion that's being asserted as a basis for not providing a duty to defend to the Kennedys. The house, no, I consider the licensing the same as the business pursuits exclusion. That's one provision. The household residence exclusion, yes. For that to work to Erie's favor, the term if residents of your household has to apply only to relatives. It couldn't carry over to persons under the age of 21 in the care of the insurant. This language has also been looked at by other courts, found to be ambiguous, and it is. Our reading is supported by one Illinois case, that's the country mutual case, and the point of that case, it was the death of a foster care child while in the care of foster parents, and the court engaged in an analysis as to whether or not that foster child was a resident of the foster parent's home. If Erie's right, then that analysis that the appellate court engaged in wouldn't have been necessary. It wouldn't have been necessary at all. There had to be a determination about residency. Our reading of that exclusion also comports with how Erie defines anyone we protect. With respect to insured status under the Erie policies, residency is taken into account, and that's the point of the household residence exclusion, is that we want to prevent collusion, and we want to bring home the notion that these homeowners' policies don't cover injuries to insureds or those with whom insureds are closely associated. The trial judge found that, in his interpretation, that it didn't cover injury to residents of the household, right? That Abby would have had to have... Correct. Abby would have had to have been a resident for the exclusion to have been applicable. That's correct, and we believe both findings are correct and supported by the only Illinois case that we know to be in existence that discusses this issue. I know that Erie has its own set of cases. They're all from out of state, talking about a different result, but that just, again, emphasizes that courts have gone either way on this particular provision, and clearly it's capable of multiple reasonable interpretations, and it's ambiguous. I was doing a good job of following your argument until Justice Carter asked his question,  what did the judge find with respect to paragraph 12, bodily injury? In order for... Okay, let's read through that provision really quick. And if... So your argument is, if I understand it correctly, a two-year-old is under the age of 21, and the two-year-old was in her care. Correct, but that's not what the exclusion says. She's got to be a resident for it to apply, and she's not. So you agree with the judge's intuition? Absolutely. All right, now I'm with you. And then the judge also found that the provision was ambiguous as well, which we would agree with that finding. Now, this policy defines business. Correct, although not clearly. Okay, but it defines business, but it doesn't... There's no definition when something's occasional and when something's full-time. Correct, and we pointed that out. If the definition of business can mean occasional, regular, it talks about all different kinds of temporal aspects, if you will, then what's it mean to provide coverage for occasional business pursuits? It's clear as mud. It's not at all, not defined. There's no definition for the pursuits or activity. Correct. Okay, but they're critical in analysis. What is the business activity and what is... A non-business activity? Absolutely, and if we can't discern that from the language that's in front of us, Erie loses. That's what happens here, and our argument is centered on that the underlying tort complaint concerns a non-business activity. It concerns maintaining that swimming pool, and that that's something for which there's not a connection to profit motive, that there's something completely extraneous to the daycare operation that was the actual thing that harmed Abby. I took my kids to daycare. Adlers, I expected that they would be supervised and within arm's reach of the daycare providers. To me, supervision of the child is the activity. And there are, to speak candidly, there are different ways, different lines of interpretation for this particular policy language, and there have been courts that have focused on that and said any time we're talking about premises or a condition of the premises and a failure to supervise, exclusion applies. There are courts that have done that. The Stanley case is a good example of that. That's the one most frequently cited. But in Illinois, the only case law we have is the Moore case and Bassett, which are the case law that's a different line of thinking, and we apply that it's a different result. And if Erie wants something different, a different analysis, they need to just change their policy language. It's an easy fix for them to do that. Well, and perhaps I'm being a little facetious saying it that way, but I mean, certainly other carriers. That's true of case law, absolutely. But there have been other carriers. Look at the cases that Erie's citing, the Mathis, the Smiley cases. Those are all a little bit later in the mid-1990s. They dropped. There's no reference to an exception. And they're being able to enforce that exclusion. If that's the analysis Erie wants, if it just wants the court to look at, you know, was this a business pursuit and did the injury arise out of the business pursuit, then that's the kind of language Erie needs to put in its policies. That's hypothetical for you. I'm sorry. The Mathis case. If there were that exception in that policy, it would be an activities test, wouldn't it? It would be, yes. Would it result in impairment under an activities test? If there were an exception? I can see where there could have been an argument made that there's this connection or affiliation with a babysitter function in that case in terms of where you put an infant down to sleep and putting it near a dresser in that case where blankets had toppled over and the child was suffocated. You would expect that would be a supervisor activity, an ordinary activity within the home. Within the home? Something I'd have a much more difficult time making a separation of the activity from the babysitting function as I'm doing here. Almost a foreseeability test. Perhaps, yes. I could see the result being different, yes. Different? I could see an argument, a more persuasive argument being made that the exclusion could apply had the facts been different in that case. But again, Illinois law isn't that we just look at supervision. And we just look at, oh, it's a premises condition and it's failure to supervise. And that's not what our facts are either. It doesn't, but I suppose if I were arguing that, I would try to make the argument that the placement of the child there where you have, a lot of daycares I know have designated areas for the child to sleep in. And if there was a misjudgment in where that occurred, then you could probably link it better to that babysitter or the function of child care perhaps. But that link I don't think exists here. Well, here, does it matter that the child is two years old versus, you know, aside from the fact that, I think there's a lack of evidence to show directly if swimming had any part, anything to do with the daycare operation. Correct. There's no evidence. But with regard to the activity and supervision and so forth, when you've got a toddler and a baby in a crib, you can see how easy it is to find that that's part of the daycare operation. If the babies are dropped off and in the crib. I see your point. I do. Not an argument that's been made here necessarily in this case, but I do see the point you're making. I was going with if there was the exception in activities test, would the outcome be different? I would posit no. Well, it's a hypothetical. That's true. It's why we have jobs, right? So we don't have clear evidence in this record about the use of the pool one way or the other. Correct. But however, with regard to daycare activities, you would think that typically the use of the pool would be different. The younger the child, the more the supervision. Correct. And so if the child is left with the plaintiff for care, the child's two, and then that child ends up, because it was an above ground pool, right? It is an above ground pool. There was a deck around the pool and a lock that I believe what happened in this instance was a pool toy had been left up against the gate so that it didn't actually latch. And that's how it was opened. The child ends up going up and down. Was that fact of the age, does that make the policy under the circumstances ambiguous or does a judge found it to be? But does that make it clear that there should have been more of the age of the child? If we're going to put everything, if we're going to shift the law, walk away from more in the particular activities test and make it about supervision of conditions of premises, then that's a much more difficult argument for me to make that the exception would apply. But that hasn't been the argument in this case. That's not been the argument Erie's made. And I don't know that that was the finding necessarily of the judge. Nothing really hinged on Abby and her specific age. No, it was not. I don't necessarily think it does. I mean, the policy says what it says and the policy mandates an examination of the activity that harmed Abby. And here it's the pool. It's not, even the underlying tort suit doesn't focus on a lack of supervision. It's not that the deck wasn't secure. It's not that she wasn't, that's not the grab-a-ment of the underlying complaint. Instead, it was about premises liability, and that's a risk that the daycare didn't enhance or create. It's something that was there. If another child wandered into the backyard and had to have encountered that, there'd be coverage for that. And it shouldn't matter here that she was in the daycare. That's our position. Thank you very much for your consideration of the case. We'd ask for an affirmance of the trial court's partial summary judgment rulings. Thank you. A couple things. Counsel for the appellee is focused on, I'll speak up. Counsel for the appellee is focused on Moore and trying to convince the court that Moore is the only persuasive decision. in Illinois. And that the court should adopt the particular activities test purportedly issued by the Moore decision. When Moore issued its decision in 1981, it gave a fairly lengthy description and analysis of the exclusion in that case. And in so doing, Moore foretold the result in this case. When Moore discussed some of the cases outside of Illinois and the facts of those cases, Moore stated that when reviewing those cases, quote, the exception does not apply to a child drowned in the insured's pool while the insured was feeding her baby. End quote. Moore has already passed on the issue before this court. If the appellees are correct that Moore is the controlling decision because Moore is one of the few cases in Illinois that includes both the exclusion and the exception, Moore has already said that drowning in a pool is not covered and the exception does not alter that. That is the result. And with Barrett, we went to Barrett. They applied an analysis thereafter and cited Moore. So how do you fit those two together? I think that they're consistent. Barrett involved the accident in the driveway. And it cited to Moore. I believe that Barrett actually cited the idea of a particular activity. And Barrett said that the driveway was sufficient to fall within the exclusion. And determined that that was related to daycare, to the operation of a daycare facility. And that the drowning was not a part of the daycare business. I would also like to point out, Your Honor, that the idea that there would be any difference in this case, even if there were no exception, is contradicted by the analysis in both Mathis and Smiley. First of all, in Smiley, again, the drowning case, Smiley, which did not have the exception, the court said, it is clear Conner's injuries arose out of Helene Smiley's business activities. These services included the duty to exercise due care to protect Conner from any dangerous household conditions. Regardless of how defendants attempt to characterize Smiley's actions as a failure to supervise Conner, as a failure to restrict Conner's access to the pool, or a failure to provide adequate locks on the gate, Conner's death unquestionably originated or came about from the daycare services Helene Smiley was paid to provide. And the same is true in the Mathis case. And the idea that there was no connection or that there's a distinction between premises and the business activity, Mathis explicitly stated that there was a, quote, direct, that the obligations were directly correlated to providing daycare services. So these are all conditions on the property. These are all directly related to the daycare operation that the insureds were supposedly running. There is no difference in this case. We start with Moore, which already said that a drowning incident is not covered, including in cases and policies that have the exception to the exclusion. And that idea is followed through Smiley and all the way to Mathis. There is no authority in Illinois to support the idea that this exclusion should not be enforced. Thank you.